**PUBLIC RECORD VERSION**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
TWENTIETH CENTURY FOX FILM CORPORATION, :
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, :
PARAMOUNT PICTURES CORPORATION, :
DISNEY ENTERPRISES, INC., :
CBS BROADCASTING INC., AMERICAN :
BROADCASTING COMPANIES, INC. and :
NBC STUDIOS, INC., :
                                :
        Plaintiffs/Counterclaim-Defendants, :        06 Civ. 3990 (DC)
                                  :
              v. :
                                  :
CABLEVISION SYSTEMS CORPORATION :
and CSC HOLDINGS, INC., :
                                  :
        Defendants/Counterclaim-Plaintiffs. :
-------------------------------------------------------------------X

### MEMORANDUM IN SUPPORT OF
### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Robert Alan Garrett (pro hac vice)
Hadrian R. Katz (pro hac vice)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000

Peter L. Zimroth (PZ-1029)
Eleanor M. Lackman (EL-3668)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022-4690
(212) 715-1000

*Counsel for Plaintiffs/Counterclaim
Defendants*

Of Counsel:

Simon Barsky (pro hac vice)
Gregory P. Goeckner (pro hac vice)
15503 Ventura Blvd.
Encino, California 91436

## Table of Contents

| | | Page |
|---|---|---|
| Table of Authorities | | ii |
| PRELIMINARY STATEMENT | | 1 |
| STATEMENT OF FACTS | | 1 |
| | A. | The Parties | 2 |
| | B. | The Proposed Service | 3 |
| ARGUMENT | | 4 |
| Cablevision's Unlicensed On-Demand Programming Service Would Infringe Copyright Owners' Exclusive Public Performance and Reproduction Rights under Section 106 of the Copyright Act | | 4 |
| | A. | Cablevision Would Infringe Copyright Owners' Exclusive Right of Public Performance by Providing an Unauthorized Secondary Transmission Service | 6 |
| | B. | Cablevision Would Infringe Copyright Owners' Exclusive Reproduction Rights by Providing an Unauthorized Copying Service | 15 |
| CONCLUSION | | 20 |

**Table of Authorities**

PAGE(S)

CASES:

*Agee v. Paramount Communications, Inc.,*
    59 F.3d 317 (2d Cir. 1995).................................................................. 18

*Basic Books, Inc. v. Kinko's Graphics Corp.,*
    758 F. Supp. 1522 (S.D.N.Y. 1991)...................................................... 17, 19

*Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Systems,*
    746 F. Supp. 320 (S.D.N.Y. 1990) ....................................................... 14

*Coleman v. ESPN, Inc.,*
    764 F. Supp. 290 (S.D.N.Y. 1991) ....................................................... 14

*Columbia Pictures Industries v. Redd Horne, Inc.,*
    749 F.2d 154 (3d Cir. 1984)................................................................. 12, 13

*CoStar Group, Inc. v. LoopNet, Inc.,*
    373 F.2d 544 (4th Cir. 2004) ............................................................... 18

*David v. Showtime/The Movie Channel, Inc.,*
    697 F. Supp. 752 (S.D.N.Y. 1988) ....................................................... 13, 14

*Elektra Records Co. v. Gem Electronic Distributors, Inc.,*
    360 F. Supp. 821 (E.D.N.Y. 1973) ....................................................... 18

*Freeplay Music, Inc. v. Cox Radio, Inc.,*
    404 F. Supp. 2d 548 (S.D.N.Y. 2005).................................................... 12

*Freier v. Westinghouse Electric Corp.,*
    303 F.3d 176 (2d Cir. 2002),
    *cert. denied,* 538 U.S. 998 (2003)........................................................ 10

*Infinity Broadcasting Corp. v. Kirkwood,*
    150 F.3d 104 (2d Cir. 1998).................................................................. 14, 15, 20

*Los Angeles News Serv. v. Reuters Television Int'l, Inc.,*
    149 F.3d 987 (9th Cir. 1998),
    *cert. denied,* 525 U.S. 1141 (1999)....................................................... 20

*MAI Systems Corp. v. Peak Computer, Inc.,*
    991 F.2d 511 (9th Cir. 1993),
    *cert. dismissed,* 532 U.S. 941 (2001).................................................... 16

*Modern Publ'g v. Landoll, Inc.,*
    841 F. Supp. 129 (S.D.N.Y. 1994) ....................................................... 12

*National Ass'n of Broadcasters v. Copyright Royalty Tribunal,*
    809 F.2d 172 (2d Cir. 1986)................................................................. 7

*National Cable Television Ass'n v. Copyright Royalty Tribunal,*
    489 F.2d 1077 (D.C. Cir. 1982)............................................................ 5

ii

*National Football League v. Primetime 24 Joint Venture,*
   211 F.3d 10 (2d Cir. 2000),
   *cert. denied,* 510 U.S. 1033 (1994) ............................................................................ 14

*New York Times Co. v. Tasini,*
   533 U.S. 483 (2001) ................................................................................................ 12, 19

*On Command Video Corp. v. Columbia Pictures Industries, Inc.,*
   777 F. Supp. 787 (N.D. Cal. 1991) ......................................................................... 11, 12

*Playboy Enterprises, Inc. v. Frena,*
   839 F. Supp. 2d 1552 (M.D. Fla. 1993) ...................................................................... 20

*Princeton University Press v, Michigan Document Services.*
   99 F.3d 1381 (6th Cir. 1996) (en banc),
   *cert. denied,* 520 U.S. 1156 (1997) ................................................................... 17, 19, 20

*RCA/Ariola Int'l v. Thomas & Grayston Co.*
   845 F.2d 773 (8th Cir. 1988) ....................................................................................... 18

*RCA Records v. All-Fast Systems, Inc.,*
   594 F. Supp. 335 (S.D.N.Y. 1984) .............................................................................. 19

*Religious Technology Center v. Netcom On-Line Communication*
   *Services, Inc.,*
   907 F. Supp. 1361 (N.D. Cal. 1995) ........................................................................... 18

*Robinson v. Random House, Inc.,*
   877 F. Supp. 830 (S.D.N.Y. 1995) .............................................................................. 12

*Robinson v. Shell Oil Co.,*
   519 U.S. 337 (1997) ..................................................................................................... 10

*SHL Imaging, Inc. v. Artisan House, Inc.,*
   117 F. Supp. 2d 301 (S.D.N.Y. 2000) ......................................................................... 12

*Sony Corp. v. Universal City Studios, Inc.,*
   464 U.S. 417 (1984) ................................................................................................ 19, 20

*UMG Recordings, Inc. v. MP3.com, Inc.,*
   92 F. Supp. 2d 340 (S.D.N.Y. 2000) ..................................................................... 16, 17, 20

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.,*
   192 F. Supp. 2d 321 (D.N.J. 2002),
   *aff'd on other grounds,* 342 F.3d 191 (3d Cir. 2003),
   *cert. denied,* 540 U.S. 1178 (2004) ...................................................................... 13, 20

*WGN Continental Broadcasting Co. v. United Video Inc.,*
   693 F.2d 622 (7th Cir. 1982) ......................................................................................... 7

STATUTORY PROVISIONS

   Section 101 of the Copyright Act, 17 U.S.C. § 101 ........................................... 7, 8, 9, 15, 16

   Section 106 of the Copyright Act, 17 U.S.C. § 106 ..................................................... 4, 5

iii

Section 106(1) of the Copyright Act, 17 U.S.C. § 106(1) ................................................ 15, 16

Section 106(4) of the Copyright Act, 17 U.S.C. § 106(4) ................................................ 8

Section 106(6) of the Copyright Act, 17 U.S.C. § 106(6) ................................................ 10

Section 111(c) of the Copyright Act, 17 U.S.C. § 111(c) ................................................. 5

Section 111(f) of the Copyright Act, 17 U.S.C. § 111(f) .................................................. 5, 6

Section 112(e) of the Copyright Act, 17 U.S.C. § 112(e) ................................................. 16

Section 114 of the Copyright Act, 17 U.S.C. § 114 .......................................................... 10

Section 114(d) of the Copyright Act, 17 U.S.C. § 114(d) ................................................ 10, 11

Legislative Materials

H.R. Rep. No. 90-83 (1967) .............................................................................................. 10, 12

H.R. Rep. No. 94-1476 (1975)
    *reprinted in* 1976 U.S.C.C.A.N. 5659 ........................................................................ 5, 6, 8, 9

S. Rep. No. 104-128 (1995),
    *reprinted in* 1995 U.S.C.C.A.N. 356 ........................................................................... 10, 11

Miscellaneous

Federal Communications Commission, *Annual Assessment of the Status of
    Competition in the Market for the Delivery of Video Programming:
    Twelfth Annual Report* (released March 3, 2006) ........................................................ 2

II Paul Goldstein,
    *Goldstein on Copyright* § 7.7.1 (3d ed. 2005 & 2006 Supp.) ..................................... 8

II Paul Goldstein,
    *Goldstein on Copyright* § 7.7.2 (3d ed. 2005 & 2006 Supp.) ..................................... 4

Paul Goldstein,
    *International Copyright* § 5.4.I.I (b) (2001) .............................................................. 8

U.S. Copyright Office, *DMCA Section 104 Report* (August 2001) ................................. 16

U.S. Copyright Office, General Instructions, Form SA3 (Rev. 10/2005) ........................ 6

## PRELIMINARY STATEMENT

This case raises a simple issue:  May a cable television operator provide a commercial service, based entirely upon the reproduction and retransmission of copyrighted television programming, without obtaining the consent of the owners of that programming?

Cablevision claims it may do so because paying subscribers request the reproductions and retransmissions by pushing a button on their Cablevision-supplied TV remote controls.  But Cablevision is wrong.  Cablevision makes those on-demand reproductions and retransmissions through an extensive array of computers and other equipment that Cablevision itself owns, maintains and programs -- all for the sole purpose of providing the subscribers with access to copyrighted programming that Cablevision itself selects and offers the subscribers.  Under well-established principles of copyright law, Cablevision is directly responsible for the infringing reproductions and retransmissions.

Plaintiffs seek a declaratory judgment that Cablevision's unauthorized on-demand programming service would infringe their exclusive public performance and reproduction rights under Section 106 of the Copyright Act.  The effect of the relief sought by Plaintiffs would require Cablevision to negotiate appropriate licenses from individual rights-holders before commencing that service – just as cable operators and others (including Cablevision) have negotiated licenses to offer other programming services, including other on-demand services.

## STATEMENT OF FACTS

Plaintiffs' motion for summary judgment presents a pure issue of law.  None of the material facts, as set forth in Plaintiffs' Rule 56.1 statement ("56.1 Statement") and as summarized below, can be subject to any genuine dispute.  All of the parties agree that declaratory judgment is appropriate.

## A.     The Parties

Plaintiffs own the copyrights in a wide variety of motion pictures, television series and other programming.  They, like other copyright owners, license that programming for exhibition over traditional "linear channels," where programs are telecast sequentially at specified times of the day.  There are three principal types of linear channels that include Plaintiffs' programming:

1. *Broadcast stations* that viewers can receive free over-the-air, *e.g.*, stations owned by or affiliated with ABC, CBS, NBC, FBC and the new CW network;

2. *Non-broadcast "basic cable" networks* that viewers can receive only by subscribing to cable, satellite or a similar distribution service and that the service typically offers as part of a package or "tier," *e.g.*, USA Network, TNT, Disney Channel and FX; and

3. *Non-broadcast "premium cable" networks* that viewers can receive only by subscribing to cable, satellite or a similar distribution service and that the service typically offers for a per-channel fee, *e.g.*, HBO and Showtime.

*See* 56.1 Statement at ¶¶ 1-4 & 7-8.

Plaintiffs, like other copyright owners, also license programming for exhibition on a non-linear "video-on-demand" basis, *e.g.*, HBO On Demand and Disney Channel On Demand. "Video-on-demand (VOD) allows subscribers to select at any time movies and other programs they wish to view from a selection of titles stored on a remote server."  Federal Communications Commission, *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming: Twelfth Annual Report* at 9 n.23 (released March 3, 2006) ("FCC Video Competition Report"), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-06-11A1.doc (last visited Aug. 23, 2006).  Vehicles for VOD distribution include cable, satellite, Internet, DVD and wireless devices.  Plaintiffs negotiate with these VOD distributors not only license fees but also other terms and conditions that are important to them for on-demand access to their content. *See* 56.1 Statement at ¶¶ 5 & 9-11.

2

Cablevision is one of the nation's largest owners and operators of cable television systems, with approximately three million subscribers in the New York City metropolitan area. Like other cable operators, Cablevision provides its subscribers, for a fee, with different packages or tiers of linear channels of programming as well as VOD programming. For all that programming, Cablevision must either negotiate appropriate licenses or, in the case of broadcast programming, it must comply with the "compulsory licensing" requirements in Section 111 of the Copyright Act. *See* 56.1 Statement at ¶¶ 12-18.

In 2004, Cablevision began leasing its subscribers set-top digital video recorders ("DVR"), which record programs onto a hard drive located in the set-top box. *See id.* at ¶ 19. The unlicensed provision of DVRs for home recording, as part of an on-going commercial service relationship, has never been addressed by the courts but is not at issue here.

### B.     The Proposed Service

In March of 2006, Cablevision announced that it would begin offering a new service for which it coined the term "Remote Storage-DVR" or "RS-DVR" ("Service"). The Service would permit each subscriber to request, for a fee, that (1) Cablevision make copies of linear channel programming offered by Cablevision, using Cablevision equipment located at Cablevision facilities, including its "head-end"; (2) store that programming on a Cablevision server located at Cablevision's head-end; and (3) "stream" the programming from the Cablevision server to the subscriber's home set-top box for viewing at times of the subscriber's choosing, *i.e.*, on-demand. Cablevision believes that this Service would be more profitable than merely leasing set-top DVRs. *See id.* at ¶¶ 20-49.

The nature and operation of the Service are described in greater detail in the Rule 56.1 Statement. As that description makes clear,

3

- The subscriber's only role in the Service would be to request, by clicking on a Cablevision-supplied remote control, that Cablevision's equipment copy, store and stream particular programs. *See id.* at ¶¶ 23 & 43-47.

- Cablevision would have discretion to determine the policies under which programs would be copied, stored and streamed and could change those policies at any time. *See id.* at ¶¶ 26-35 & 49.

- To make and to store the copies of requested programs and to stream those programs to the subscriber, Cablevision would utilize an array of more than a dozen different computer servers, switches, routers, and other devices. All that equipment would be owned, maintained and programmed by Cablevision. All that equipment, except the set-top box, would be located at Cablevision's facilities. The sole purpose of virtually all that equipment would be to provide the Service. *See id.* at ¶¶ 36-42.

- No programming could be copied, stored or streamed unless Cablevision itself made that programming available as part of the Service, including programs in which Plaintiffs own the copyright or an exclusive license. Subscribers could request the copying, storage and streaming only of programming on the channels that Cablevision had selected to offer over its system and as part of the Service. *See id.* at ¶¶ 26-34.

- Cablevision would allow subscribers to request the copying, storage and streaming, as part of the Service, of some of the very same programs that Plaintiffs and other copyright owners are licensing or are seeking to license as VOD programming. *See id.* at ¶ 35.

Cablevision does not have any license from copyright owners to offer its Service, and it has no intention of obtaining such a license. Indeed, it has expressly rejected proposals by some content providers to negotiate licenses. No Plaintiff or any other copyright owner has agreed that Cablevision may provide its proposed Service without a license. *See id.* at ¶¶ 50-53.

## ARGUMENT

### Cablevision's Unlicensed On-Demand Programming Service Would Infringe Copyright Owners' Exclusive Public Performance and Reproduction Rights under Section 106 of the Copyright Act

It is a "central copyright principle" that "all who derive value from using a copyrighted work should pay for that use . . . ." II Paul Goldstein, *Goldstein on Copyright* § 7.7.2, at 7:158 (3d ed. 2005 & 2006 Supp.). Section 106 of the Copyright Act, 17 U.S.C. § 106, reflects that principle by affording copyright owners the exclusive rights to, among other things, publicly

perform and reproduce their copyrighted works and to authorize others to publicly perform and reproduce their works. No commercial entity may exploit and profit off the performance and reproduction rights accorded copyright owners, as Cablevision proposes to do, without obtaining the appropriate copyright licenses. The requirement that cable operators such as Cablevision secure the requisite licenses to make commercial use of copyrighted television programming is particularly entrenched in the Copyright Act.

Indeed, one of the most significant issues that Congress considered during the decade-long debates leading to passage of the Copyright Act of 1976 concerned the circumstances under which cable systems may make copyrighted programming available to their subscribers. *See* H.R. Rep. No. 94-1476, at 47-48 (1975), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5560-61 ("1975 House Report") (noting that the dispute over cable copyright liability was primarily responsible for delaying passage of legislation to revise the entire 1909 Copyright Act). Congress resolved that dispute by making clear that cable systems are engaged in making public performances when they provide (*i.e.*, retransmit) programming to their subscribers. *See id.* at 52-53, 1976 U.S.C.C.A.N. at 5665-66. Congress granted cable systems a very limited compulsory (or "statutory") license to retransmit broadcast programming to their subscribers. *See* 17 U.S.C. § 111(c) (Statutory Appendix at Tab 4); 1975 House Report at 89-90, 1976 U.S.C.C.A.N. at 5703-05; *National Cable Television Ass'n v. Copyright Royalty Tribunal,* 689 F.2d 1077, 1079-80 (D.C. Cir. 1982). But that compulsory license applies only to programming on broadcast stations -- not to cable network and other programming -- and it is subject to specified conditions.

One critically important condition of the limited compulsory license is that the cable system must retransmit the programming *at the same time* it is broadcast without making any copies of the programming. *See* 17 U.S.C. § 111(f) (defining "secondary transmission," which is

5

the subject of compulsory licensing, as the "further transmitting of a primary transmission [of a broadcast station] *simultaneously* with the primary transmission") (emphasis added) (Statutory Appendix at Tab 4). As the Copyright Office -- the expert federal agency charged with implementing Section 111 -- has correctly concluded:

> **What A Statutory License Does Not Permit You To Do**
>
> The statutory authority given to cable systems to retransmit television and radio broadcasts under a statutory license is limited in several ways:
>
> * * *
>
> **Nonsimultaneous Retransmissions.** In general, to be subject to statutory licensing under the copyright law, a cable retransmission must be simultaneous with the broadcast being carried. As a rule, taping or other recording of the program is not permitted. Taping for delayed retransmission is permissible only for some (not all) cable systems located outside the 48 contiguous States; and, even in these exceptional cases, there are further limitations and conditions that the cable system must meet.

Copyright Office, General Instructions, Form SA3, page (ii) (Rev. 10/2005) (emphasis in original), *available at* http://www.copyright.gov/forms/SA3-2005.pdf (last visited Aug. 22, 2006). *See also* 1975 House Report at 91, 1976 U.S.C.C.A.N. at 5705-06 (except in limited circumstances involving off-shore cable systems, Section 111 *"does not cover or permit a cable system, or indeed any person, to tape or otherwise record a program off-the-air and later to transmit the program from the tape or record to the public"*) (emphasis added).

Cablevision asserts it has found a way to circumvent the legislative policy embodied in Section 111 – by having individual subscribers request that Cablevision make copies and delayed (non-simultaneous) retransmissions of particular broadcast programs. The law is to the contrary.

### A. Cablevision Would Infringe Copyright Owners' Exclusive Right of Public Performance by Providing an Unauthorized Secondary Transmission Service

Section 106(4) of the Copyright Act, 17 U.S.C. § 106(4) (Statutory Appendix at Tab 2), affords copyright owners of motion pictures and other works the exclusive right to "perform the

copyrighted work publicly."   A cable system makes such "public performances" when it retransmits programming to its subscribers.   *See, e.g., National Ass'n of Broadcasters v. Copyright Royalty Tribunal*, 809 F.2d 172, 179 n.9 (2d Cir. 1986) ("Cable retransmissions are recognized as public performances under § 106(4)"), citing *WGN Cont'l Broad. Co. v. United Video Inc.*, 693 F.2d 622, 625 (7th Cir. 1982) (Posner, J.).   Likewise, Cablevision's retransmission of a linear channel program to its subscribers on both a simultaneous and a delayed basis constitutes a "public performance" that requires a license from the program owner. The fact that Cablevision would stream the program in response to a particular subscriber's request does not exempt Cablevision from the legal requirement to obtain that license.

      1.    Section 101 of the Copyright Act provides in relevant part that to "perform a work 'publicly' means" --

> (2)    to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and *at the same time or at different times.*

17 U.S.C. § 101 (Statutory Appendix at Tab 1) (emphasis added) ("Transmit Clause").  The act of streaming a program from Cablevision's head-end to the subscriber as part of the proposed Service satisfies each of the elements of the Transmit Clause -- "to perform," "to transmit," "to the public."

      **To Perform.**  Section 101 of the Copyright Act defines the term "perform" in the "most embracing terms."  II Paul Goldstein, *Goldstein on Copyright* § 7.7.1, at 7:156 (3d ed. 2005& 2006 Supp.).  To "perform" a work means "to recite, render, play, dance, or act it either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible."  17 U.S.C. § 101 (Statutory Appendix at Tab 1).  The legislative history of the 1976 Copyright Act

7

also "suggests the definition's broad sweep." Paul Goldstein, *International Copyright* § 5.4.I.I.(b), at 265 (2001). Indeed, Congress specifically noted that: (a) a performance can be accomplished by any "techniques and systems" even if not in "use or invented" at the time of the Act's passage; and (b) "a cable television system is performing when it retransmits the broadcast to its subscribers." 1975 House Report at 63, 1976 U.S.C.C.A.N. at 5677; *see also id.* at 87, 1976 U.S.C.C.A.N. at 5701 (referring to the "broad definition of 'perform' in Section 101").

**To Transmit.** Section 101 of the Act states that the term "transmit," as used in the Transmit Clause, means to "communicate [the performance] by any device or process whereby images or sounds are received beyond the place from which they are sent." (Statutory Appendix at Tab 1). The legislative history notes that this definition is

> broad enough to include all conceivable forms and combinations of wired or wireless communications media, including but by no means limited to radio and television broadcasting as we know them. Each and every method by which the images or sounds comprising a performance . . . are picked up and conveyed is a "transmission," and if the transmission reaches the public in any form, the case comes within the scope of [Section 106(4)].

1975 House Report at 64, 1976 U.S.C.C.A.N. at 5678. The definition of "transmit" is certainly broad enough to encompass the act of streaming a program from Cablevision's head-end to the subscriber's set-top box.

**To The Public.** As noted above, Section 101 clarifies that the transmission is "to the public" regardless of "whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and *at the same time or at different times*." (Emphasis added.) The legislative history of the 1976 Copyright Act further explains:

> Under the bill, as under the present law, a performance made available by transmission to the public at large is "public" even though the recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission. The same

8

> principles apply whenever the potential recipients of the transmission represent a limited segment of the public, such as the occupants of hotel rooms *or the subscribers of a cable television service.*

1975 House Report at 64-65, 1976 U.S.C.C.A.N. at 5678 (emphasis added).

As the language and legislative history of Section 101 make clear, retransmissions of the performance embodied in a program to different cable subscribers constitute a "public" performance, even when those retransmissions are separated in time. Thus, the retransmission of such a performance to any individual subscriber cannot be viewed in isolation. Rather, it must be seen as an integral part of a service that retransmits the same performance in a particular program to different subscribers at different times. Cablevision's proposed on-demand Service would retransmit the same performance in a particular program to different members of the public who would receive those retransmissions at "different times," within the meaning of Section 101 -- some simultaneously with the initial performance and some on a delayed basis at times of the subscribers' choosing. Cablevision's proposed service would thus make retransmissions "to the public" within the meaning of the Transmit Clause.

2.      Cablevision appears to claim that, notwithstanding the plain language of Section 101, streaming a program to a subscriber is not a public performance because the subscriber requested or "initiated" the stream by pushing a button on his or her Cablevision-supplied remote control. But that claim finds no support in the text or the legislative history of the Copyright Act. To the contrary, Congress specifically noted that a transmission is made "to the public" if it

> is capable of reaching different recipients at different times, as in the case of sounds or images stored in an information system and capable of being performed or displayed *at the initiative of individual members of the public.*

9

H.R. Rep. No. 90-83, at 29 (1967) (emphasis added). Thus, regardless of whether Cablevision may engineer its service so that subscribers may "initiate" the timing of the transmission, that transmission is a public performance under the Copyright Act.

Furthermore, Cablevision's position -- that its retransmissions would not result in public performances because they are made on-demand at the request of individual subscribers -- would be inconsistent with Section 114 of the Copyright Act, 17 U.S.C. § 114 (Statutory Appendix at Tab 6). That is because much of Section 114 would be unnecessary if Cablevision's position were correct. *See, e.g., Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 197 (2d Cir. 2002) (in construing one provision of a statute, courts typically consider how that construction relates to other provisions of the same statute), *cert. denied*, 538 U.S. 998 (2003) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

Section 114 limits, with certain exemptions and compulsory licenses, the public performance right accorded copyright owners of sound recordings. *See* 17 U.S.C. § 106(6) (Statutory Appendix at Tab 2) (granting copyright owners of sound recordings the exclusive right "to perform the copyrighted work publicly by means of a digital audio transmission."). Section 114 presumes that a service makes a public performance when it transmits or retransmits a copyrighted work to an individual who specifically requests that work.[1] Indeed, the impetus

---

[1] *See* 17 U.S.C. § 114(d)(1) (interactive services do not come within Section 114 exemptions from sound recording performance right); *id.* § (2)(A)(i) (interactive services are not eligible for the Section 114 compulsory license); *id.* § (d)(3)(A) (restricting the ability of sound recording copyright owners to grant exclusive performance licenses to interactive services); *id.* § (d)(3)(C) (performance right in sound recordings does not affect the requirement that interactive services obtain performance rights for musical work owners); *id.* § (d)(3)(D) (defining circumstances in which retransmission of an interactive service would not constitute an infringement of the sound recording performance right); *id.* § (e)(2) (authorizing sound recording copyright owners to designate common agents to grant performance licenses to interactive services); and *id.* § (j)(7) (defining "interactive service" to include a service that transmits sound recordings "selected by or on behalf of the recipient.") (Statutory Appendix at Tab 6). *See also* S. Rep. No. 104-128, at
Footnote continued on next page

10

for the Digital Performance Rights Act of 1995, which made extensive amendments in Section 114, included interactive services "such as so-called 'celestial jukebox,' 'pay-per-listen' or 'audio-on-demand services' . . . ." *See* S. Rep. No. 104-128, at 14 (1995), *reprinted in* 1995 U.S.C.C.A.N. 356, 361.

3.      The courts have consistently found that transmitting copyrighted works on-demand, at the request of a particular subscriber, constitutes a public performance. For example, the declaratory plaintiff in *On Command Video Corp. v. Columbia Pictures Industries*, 777 F. Supp. 787, 789-90 (N.D. Cal. 1991), had developed a system for the electronic delivery of movies from a centrally located bank of videocassette players ("VCP") to individual hotel rooms. Each VCP contained a single movie. When a hotel guest chose the movie he or she wished to view (by pressing the appropriate buttons on a remote control), a computer would identify the VCP containing that movie, switch that VCP to the guest's room, and then begin playing the movie. The guest was thus able to view the movie on-demand, at the time he or she determined. During the period that the guest viewed the movie, no one else in the hotel could do so, *i.e.*, the transmission went solely to the guest who had requested it. *Id.* at 788-89.

On cross-motions for summary judgment,[2] the court concluded that On Command had made unauthorized public performances, rejecting the argument that On Command had simply made "'electronic rentals' similar to patrons' physical borrowing of videotapes . . . ." *Id.* at 789.

---

Footnote continued from previous page
18, 24, 25-26 & 33 (1995), *reprinted in* 1995 U.S.C.C.A.N. 356 at 365, 371, 372-73, 378 (recognizing that on-demand services would need public performance licenses).

[2] Other copyright cases in which courts have granted summary judgment on cross-motions include *Freeplay Music, Inc. v. Cox Radio, Inc.*, 404 F. Supp. 2d 548, 555 (S.D.N.Y. 2005); *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 318 (S.D.N.Y. 2000); *Robinson v. Random House, Inc.*, 877 F. Supp. 830, 845 (S.D.N.Y. 1995); and *Modern Publ'g v. Landoll, Inc.*, 841 F. Supp. 129, 134 (S.D.N.Y. 1994). *See also New York Times Co. v. Tasini*, 533 U.S. 483, 492-93 (2001) (affirming Second Circuit's decision to grant judgment in favor of plaintiffs on cross-motions for summary judgment).

The court reached several additional conclusions which leave no doubt that Cablevision too
would make unauthorized public performances if it implemented its proposed on-demand
Service:

- "The fact that hotel guests initiate this transmission by turning on the television
  and choosing a video is immaterial." *Id.* at 790.

- "On Command's video transmissions are also 'to the public' for the purposes of
  the transmit clause. Hotel guests watching a video movie in their room through
  On Command's system are not watching it in a 'public place' but they are
  nonetheless members of 'the public.' . . . This is because the relationship between
  the transmitter of the performance, On Command, and the audience, hotel guests,
  is a commercial 'public' one regardless of where the viewing takes place. The
  non-public nature of the place of the performance has no bearing on whether or
  not those who enjoy the performance constitute 'the public' under the transmit
  clause." *Id.* (citations omitted).

- The legislative history of the 1976 Act reveals that Congress intended clause (2)
  [the Transmit Clause] to cover "precisely the sort of single-viewer system
  developed by [On Command]." *Id.*, citing H.R. Rep. No. 90-83, at 29 (1967).

- "[W]hether the number of hotel guests viewing an On Command transmission is
  one or one hundred, and whether these guests view the transmission
  simultaneously or sequentially, the transmission is still a public
  performance . . . ." *Id.*

To the same effect is *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, 749 F.2d

154 (3d Cir. 1984). There the defendant, a videocassette shop owner, transmitted movies from a

centralized area in one part of its store to private screening rooms (accommodating 2-4 persons

who had selected the movies to be played) in another part of the store. The court held that these

transmissions come within, among other things, the Transmit Clause, explaining:

> [T]he transmission of a performance to members of the public,
> even in private settings such as hotel rooms, . . . constitutes a
> public performance. As the statutory language and legislative
> history clearly indicate, the fact that members of the public view
> the performance at different times does not alter this legal
> consequence.

*Id.* at 159.

The relevant facts in *Redd Horne* are indistinguishable from those surrounding Cablevision's proposed on-demand service. In both cases, the defendants choose the universe of programming available to their customers; the customer selects the specific programming to be viewed and the time he or she wishes to view the programming; the defendants transmit that programming from one location, where a copy of the program is available, to another location, where the customer turns on a television set to view the programming; and that particular transmission is not made to any other customer although both defendants make separate transmissions of the program to other customers at different times. *See also Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 192 F. Supp. 2d 321, 331-32 (D.N.J. 2002) (on-demand streaming over the Internet of specific video clips requested by individuals constitutes public performances), *aff'd on other grounds*, 342 F.3d 191 (3d Cir. 2003), *cert. denied*, 540 U.S. 1178 (2004).

4.    The law in the Second Circuit concerning the definition of public performance reaffirms and provides further support for the conclusions reached in the cases discussed above. For example, in *David v. Showtime/The Movie Channel, Inc.*, 697 F. Supp. 752 (S.D.N.Y. 1988), the court held that transmissions made by the non-broadcast programming service Showtime/The Movie Channel ("SMC") to cable system head-ends (for retransmission to cable subscribers) constituted public performances under the Transmit Clause. The court in *David* found that the "concept of 'public performances' should be interpreted broadly" and that the legislative history of the 1976 Act reflects a "preference for an expansive reading" of that concept. *Id.* at 758-59. The court continued:

> Congress intended the definitions of "public" and "performance" to encompass each step in the process by which a protected work wends its way to its audience. Moreover, it would strain logic to conclude that Congress would have intended the degree of

13

> copyright protection to turn on the mere method by which
> television signals are transmitted to the public.

*Id.* at 759. *Accord National Football League v. Primetime 24 Joint Venture*, 211 F.3d 10, 13 (2d

Cir. 2000) ("the most logical interpretation of the Copyright Act is to hold that a public

performance or display includes 'each step in the process by which a protected work wends its

way to its audience'") (quoting *David*, 697 F. Supp. at 759), *cert. denied*, 532 U.S. 941 (2001).

*See also Coleman v. ESPN, Inc.*, 764 F. Supp. 290, 294 (S.D.N.Y. 1991); *Broadcast Music, Inc.

v. Hearst/ABC Viacom Entm't Sys.*, 746 F. Supp. 320, 328-29 (S.D.N.Y. 1990).

Cablevision's copying, storage and delayed streaming of a particular program are all

"step[s] in the process by which a protected work wends its way to its audience," within the

contemplation of the *David* and *NFL* decisions.

The Second Circuit's decision in *Infinity Broadcasting Corp. v. Kirkwood*, 150 F.3d 104

(1998) ("*Infinity*"), also confirms that Cablevision's Service would involve unauthorized public

performances. The defendant in that case (Kirkwood) operated an unauthorized commercial

retransmission service that is closely analogous to the unauthorized commercial retransmission

service that Cablevision proposes. Kirkwood allowed subscribers, for a fee, to listen over

telephone lines to radio programs that the subscribers chose from those programming services

that Kirkwood made available -- in the same way that Cablevision proposes to allow subscribers,

for a fee, to view video programming that the subscribers choose from those programming

services that Cablevision makes available. There was no issue before the court of appeals that

Kirkwood's retransmissions constituted public performances (notwithstanding that they were

provided at the request of paying subscribers). The question was simply whether Kirkwood was

entitled to the fair use defense (a defense that Cablevision has waived in this case). The court

correctly rejected that defense, concluding that Kirkwood had "not met his burden of showing

14

that his use of Infinity's broadcasts does not infringe Infinity's copyrights." 150 F.3d at 112.

Cablevision's comparable use of copyrighted programming would likewise infringe the

exclusive public performance rights held by Plaintiffs and other copyright owners.

### B.   Cablevision Would Infringe Copyright Owners' Exclusive Reproduction Rights by Providing an Unauthorized Copying Service

1.   Section 106(1) of the Copyright Act, 17 U.S.C. § 106(1), affords copyright

owners the exclusive right to "reproduce the copyrighted work in copies . . . ." (Statutory

Appendix at Tab 2). Section 101 defines the term "copies" as

> material objects, other than phonorecords, in which a work is fixed
> by any method now known or later developed, and from which the
> work can be perceived, reproduced, or otherwise communicated,
> either directly or with the aid of a machine or device. The term
> "copies" includes the material object, other than a phonorecord, in
> which the work is first fixed.

17 U.S.C. § 101 (Statutory Appendix at Tab 1). A work is "fixed" in a "tangible medium of

expression" when its "embodiment in a copy or phonorecord, by or under the authority of the

author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise

communicated for a period of more than transitory duration." *Id.*

There is no dispute that Cablevision's proposed service will result in the making of

unlicensed "copies," within the meaning of Section 101. Cablevision acknowledges that at least

one copy of each program requested by each subscriber will be made and then stored on a

portion of a Cablevision server supposedly identified with that subscriber. These individual

server copies are themselves sufficient to establish that Cablevision's Service would infringe the

exclusive reproduction rights of Plaintiffs and other copyright owners. That is because the

unlicensed server copies are all made through the use of computers and other equipment that

Cablevision itself owns, maintains and programs for the sole purpose of reproducing (and

15

retransmitting) copyrighted programming on linear channels that Cablevision selects and makes available to its subscribers.[3]

2.    The facts here are directly analogous to those in *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000) ("*MP3.com*"). The defendant in that case reproduced onto servers numerous CDs it had purchased; it then offered a service that would stream via the Internet the music from a particular CD to a requesting subscriber -- provided the subscriber could prove he or she owned a copy of the CD to be accessed. As the court concluded:

> [A]lthough defendant seeks to portray its service as the "functional equivalent" of storing its subscribers' CDs, in actuality defendant is re-playing for the subscribers converted versions of the recordings it copied, without authorization, from plaintiffs' copyrighted CDs. On its face, this makes out a presumptive case of infringement under the Copyright Act . . . .

92 F. Supp. 2d at 350 (citations omitted); *see id.* ("Defendants' infringement of plaintiffs' copyrights is clear.").

As in *MP3.com,* Cablevision has proposed a centralized storage service that would afford its paying subscribers on-demand access to copyrighted works. As in *MP3.com*, Cablevision seeks to offer that service by making copies (and retransmissions) of those works without obtaining the consent of the affected copyright owners. As in *MP3.com,* such conduct

---

[3] To make server copies, Cablevision also must make various "cache" or "buffer" copies, which cannot be associated with any particular subscriber. Each of these copies also would constitute a reproduction, within the meaning of Section 106(1) of the Copyright Act, that must be licensed. *See* U.S. Copyright Office, *DMCA Section 104 Report*, at 107-17 (August 2001), *available at* http://www.copyright.gov/reports/ (last visited Aug. 23, 2006); 17 U.S.C. § 112(e) (affording a compulsory license to make cache or buffer copies in connection with the streaming of sound recordings) (Statutory Appendix at Tab 5); *MAI Sys. Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 518-19 (9th Cir. 1993), *cert. dismissed*, 510 U.S. 1033 (1994). But even if there were no cache or buffer copies, the server copies alone provide a sufficient basis for concluding that Cablevision's Service would infringe Plaintiffs' reproduction rights.

constitutes copyright infringement.  To be sure, the defendant in *MP3.com* made copies of the sound recordings before being requested to do so.  But that difference is immaterial.  The Copyright Act affords copyright owners the exclusive right to make, and to authorize the making of, copies of their works.  It makes no difference under the law whether the unauthorized copies are made before or after a specific request for them.

Cablevision argues that it is the subscriber who requests that copies be made and thus it is the subscriber, not Cablevision, who makes the copies and is responsible for any infringement. That argument, however, is squarely inconsistent with established law.  For example, the courts have held copy shops directly liable for the copying of course packets compiled by university professors -- notwithstanding that the professors themselves had requested the copy shops to use their equipment to make the infringing reproductions.  *See, e.g., Princeton Univ. Press v. Michigan Document Servs.*, 99 F.3d 1381, 1389 (6th Cir. 1996) (en banc), *cert. denied,* 520 U.S. 1156 (1997) ("*Princeton*"); *Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F. Supp. 1522, 1526 (S.D.N.Y. 1991); *Elektra Records Co. v. Gem Elec. Distribs., Inc.,* 360 F. Supp. 821 (E.D.N.Y. 1973).  Likewise, in *RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.,* 845 F.2d 773 (8th Cir. 1988), the court held retailers who operated audio recording machines directly liable for infringement -- notwithstanding that they merely copied sound recordings at the request of third parties.

Cablevision's subscribers do nothing more than push a button on a Cablevision-supplied remote control to request that a program be copied and then retransmitted at a time of their choosing.   That minimal involvement stands in stark contrast to the substantial role that Cablevision plays in the violation of copyright owners' rights -- from selecting the programming that is available for unauthorized copying and retransmission to setting up, operating,

17

maintaining and controlling an elaborate technological system that is used for the sole purpose of making such unauthorized copies and retransmissions. In fairness and equity, as well as under established copyright principles, Cablevision bears direct responsibility for the infringing copies (and retransmissions).[4]

3.    Cablevision does not argue that its proposed commercial reproduction (and retransmission) service would constitute fair use; Cablevision has waived that argument. *See* Order, dated June 7, 2006; *see also Infinity, supra* (rejecting fair use defense by commercial secondary transmission service); *Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317, 323-24 (2d Cir. 1995) (rejecting commercial defendant's fair use argument based upon time-shifting).

Cablevision nevertheless attempts to hide behind its subscribers' supposed fair use defenses, claiming that it is merely facilitating the exercise of consumer fair use recognized in *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*").[5] The courts, however,

---

[4] Cablevision's apparent reliance upon *Netcom* and its progeny is also misplaced. In *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*"), the court held that an Internet service provider ("ISP") was not liable for making copies of copyrighted content that was thrust upon it by third parties without the ISP's knowledge. The court found that the copies were made as part of the basic functioning of the Internet, and the ISP had no capacity to monitor or control the content passing through its system. The court concluded that there needs to be "some element of volition or causation which is lacking where a defendant system is merely used to create a copy by a third party." *Id.* at 1370. *See also CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004). *Netcom* and its progeny provide no comfort to Cablevision. The courts in those cases have formulated principles for the operators of underlying Internet infrastructure, not for the providers of commercial copyrighted content copying services. *Netcom* itself requires that the defendant "not have any direct or indirect control over the content or selection of the primary transmission." *Netcom*, 907 F. Supp. at 1370 n.12 (citations omitted); *see also id.* at 1368 ("*Netcom* [did] not create or control the content of the information available to its subscribers."). In contrast, Cablevision -- for a fee -- selects which programming would be available as part of its proposed service, provides instructions to subscribers as to how to request copies and then retransmits the copied program. This is far-removed from the passive infrastructure function at issue in *Netcom*.

[5] The Court in *Sony* dealt with the narrow questions of (1) whether, on a factual record developed in the early 1980s, a consumer's making of copies of free over-the-air broadcast programming, for the sole purpose of time-shifted viewing of that programming one time in his or her home, could be considered fair use (*see Sony*, 464 U.S. at 447-55); and (2) whether the mere sale of video copying equipment with substantial noninfringing uses by a manufacturer who had no

Footnote continued on next page

have consistently rejected efforts of commercial entities, such as Cablevision, to excuse their

own commercial infringement by asserting defenses that may be raised solely by their customers.

As the Second Circuit noted in *Infinity*:

> Kirkwood likens [his service] to a library photocopy machine,
> invoked by customers whose particular use may or may not be
> infringing. However, . . . large-scale photocopying, even for the
> statutorily-approved purpose of educational use, can still infringe. .
> . . [C]ourts have rejected attempts by for-profit users to stand in the
> shoes of their customers . . . .

150 F.3d at 112, citing *Princeton*, 99 F.3d at 1389; *Basic Books*, 758 F. Supp. at 1526.[6]

Nothing in the *Sony* decision affords Cablevision the right to establish a for-profit time-

shifting service by copying (and retransmitting) copyrighted programming at the request of

paying subscribers. Indeed, the individual subscribers in *Infinity* may have had every right to

listen to the radio programming that they requested. However, that would not permit the

defendant in *Infinity* to establish a for-profit commercial service of retransmitting that

---

Footnote continued from previous page
continuing involvement with the equipment or the consumer could provide a basis to hold the
manufacturer secondarily liable for any copyright infringement committed by the consumer.
*See, e.g., New York Times Co.*, 533 U.S. at 504 ("*Sony* held that 'the sale of copying equipment'
does not constitute contributory infringement . . . [under certain circumstances].' . . . The
[defendants], however, are not merely selling 'equipment,' they are selling copies of the
[copyrighted works]" (citation omitted)); *RCA Records v. All-Fast Sys., Inc.*, 594 F. Supp. 335,
339 (S.D.N.Y. 1984) ("The *Sony* decision extends protection only to the manufacturer of
the infringing machine, not to its operator"). Plaintiffs in this case are not raising any issue about
consumers' fair use defenses or the secondary liability of equipment manufacturers.

[6] *See also Video Pipeline, supra*, 192 F. Supp. 2d at 334 (defendant "should not be able to hide
behind the lawful actions and privileges extended to its retail customers who have abided by the
Copyright Act."); *MP3.com*, 92 F. Supp. 2d at 352 ("Stripped to its essence, defendant's
'consumer protection' argument amounts to nothing more than a bald claim that defendant
should be able to misappropriate plaintiffs' property simply because there is a consumer demand
for it. This hardly appeals to conscience or equity."); *Los Angeles News Serv. v. Reuters
Television Int'l, Inc.*, 149 F.3d 987, 994 (9th Cir. 1998) ("[T]he question of whether defendants'
copying and transmission of the works constitutes fair use is distinct from whether their
subscribers' broadcasts of the work are fair use."), *cert. denied*, 525 U.S. 1141 (1999); *Playboy
Enters., Inc. v. Frena*, 839 F. Supp. 1552, 1558 (M.D. Fla. 1993) ("One who distributes
copyrighted material for profit is engaged in a commercial use even if the customers supplied
with such material themselves use it for personal use.").

programming to such paying subscribers without the service obtaining the necessary licenses to do so. And the subscribers in *MP3.com* may have had every right to listen to music that they had purchased. But that would not mean the defendant could establish an unlicensed for-profit commercial service that facilitated the ability of its subscribers to do so. Regardless of any fair use defense that Cablevision's subscribers may or may not have to time-shift broadcast programming, Cablevision itself has no right to commercially exploit Plaintiffs' copyrighted works without obtaining the requisite license.

## CONCLUSION

As noted at the outset, this is a simple case. It is undisputed that Cablevision's proposed on-demand Service will result in unauthorized copying and retransmission of copyrighted television programming by an elaborate system of computers and other equipment that Cablevision owns, maintains and programs. Cablevision's only "defense" -- that paying subscribers request Cablevision to do it -- reflects a fundamental disregard of established copyright principles. Plaintiffs are entitled to a declaratory judgment that, absent the appropriate licenses from individual rights-holders, Cablevision's proposed Service would violate Plaintiffs' exclusive reproduction and public performance rights under Section 106 of the Copyright Act.

Dated: August 25, 2006
      Washington, D.C.

Respectfully submitted,

Robert Alan Garrett (pro hac vice)
Hadrian R. Katz (pro hac vice)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
(202) 942-5000

Peter L. Zimroth (PZ-1029)
Eleanor M. Lackman (EL-3668)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022-4690
(212) 715-1000

*Counsel for Plaintiffs/Counterclaim Defendants*

Of Counsel:

Simon Barsky (pro hac vice)
Gregory P. Goeckner (pro hac vice)
15503 Ventura Blvd.
Encino, California  91436

21

## CERTIFICATE OF SERVICE

I, Anthony D. Boccanfuso, an attorney duly admitted to practice before this Court, respectfully show that on the 5th day of September, 2006, I caused the annexed **PUBLIC RECORD VERSION OF MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** to be served by Federal Express delivery upon:

> John C. Englander
> Goodwin Procter LLP
> 53 State Street
> Exchange Place
> Boston, MA 02109
>
> Benjamin Hershkowitz
> Goodwin Procter LLP
> 599 Lexington Avenue
> New York, NY 10022

Anthony D. Boccanfuso