**PUBLIC RECORD VERSION**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

TWENTIETH CENTURY FOX FILM CORPORATION, :
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, :
PARAMOUNT PICTURES CORPORATION, :
DISNEY ENTERPRISES, INC., :
CBS BROADCASTING INC., AMERICAN :
BROADCASTING COMPANIES, INC. and :
NBC STUDIOS, INC., :
: 
       Plaintiffs/Counterclaim-Defendants, :    06 Civ. 3990 (DC)
: 
       v. :
: 
CABLEVISION SYSTEMS CORPORATION :
and CSC HOLDINGS, INC., :
: 
       Defendants/Counterclaim-Plaintiffs. :

------------------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Robert Alan Garrett (pro hac vice)
Hadrian R. Katz (pro hac vice)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000

Peter L. Zimroth (PZ-1029)
Eleanor M. Lackman (EL-3668)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022-4690
(212) 715-1000

*Counsel for Plaintiffs/Counterclaim
Defendants*

<u>Of Counsel:</u>

Simon Barsky (pro hac vice)
Gregory P. Goeckner (pro hac vice)
15503 Ventura Boulevard
Encino, California 91436

## Table of Contents

|  | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| LIST OF ABBREVIATIONS | iv |
| PRELIMINARY STATEMENT | 1 |
| COUNTERSTATEMENT OF FACTS | 6 |
| ARGUMENT | 7 |
|     A.    Plaintiffs Have Properly Challenged Cablevision's Proposed Service As Direct Infringement | 8 |
|     B.    Cablevision's Proposed Service Would Make Public Performances | 13 |
| CONCLUSION | 21 |

**Table of Authorities**

Page

Cases:

*Buck v. Jewell-La Salle Realty Co.*, 283 U.S. 191 (1931) ................................................12, 15

*Capitol Records, Inc. v. Naxos of America, Inc.*, 372 F.3d 471(2d Cir. 2004)................8

*Columbia Pictures Indus. v. Professional Real Estate Investors, Inc.*, 866
    F.2d 278 (9th Cir. 1989) ........................................................................5

*Columbia Pictures Indus. v. Redd Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984) ................17, 18

*CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.2d 544 (4th Cir. 2004)................................13

*Creative Labs, Inc. v. Cyrix Corp.*, 1997 WL 337553 (N.D. Cal. 1997).........................9

*Elektra Records. Co. v. Gem Elec. Distribs., Inc.*, 360 F. Supp. 821
    (E.D.N.Y. 1973)................................................................................11

*Marobie-Fl, Inc. v. National Ass'n of Fire Equip. Distribs., Inc.*, 983 F.
    Supp. 1167 (N.D. Ill. 1997) ................................................................18

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) .................10

*National Football League v. Primetime 24 Joint Venture*, 211 F.3d 10 (2d
    Cir. 2000), *aff'g* 1999 WL 163181 (S.D.N.Y. Mar. 24, 1999) ...................19, 20

*National Football League v. Primetime 24 Joint Venture*, 1999 WL 760130
    (S.D.N.Y. 1999)................................................................................20

*New York Times Co. v. Tasini*, 533 U.S. 483 (2001) ..........................................10

*On Command Video Corp. v. Columbia Pictures Indus., Inc.*, 777 F. Supp.
    787 (N.D. Cal. 1991)........................................................................5, 17

*Paramount Pictures Corp. v. Carol Publ'g Group*, 11 F. Supp. 2d 329
    (S.D.N.Y. 1998), *aff'd mem.*, 181 F.3d 83 (2d Cir. 1999)..........................8

*Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828 (C.D. Cal. 2006) .................................10

*Playboy Enters. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503  (N.D. Ohio
    1997) ................................................................................................9

*Playboy Enterprises, Inc. v. Webbworld, Inc.*, 968 F. Supp. 1171 (N.D. Tex.
    1997) ..............................................................................................13

*Playboy Enterprises, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543 (N.D. Tex.
    1997), *aff'd mem.*, 168 F.3d 486 (5th Cir. 1999) ...............................................13

*Religious Tech. v. Netcom On-Line Commc'n Svcs., Inc.*, 907 F. Supp. 1361
    (N.D. Cal. 1995)........................................................................11, 12, 13

*Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)....................9, 10, 11, 13

*Universal City Studios, Inc. v. Sony Corp. of America*, 480 F. Supp. 429,
    457-58 (C.D. Cal. 1979), *aff'd in part rev'd in part on other grounds*,
    659 F.2d 963 (9th Cir. 1981), *cert. granted*, 463 U.S. 1226 (1983), *rev'd*,
    464 U.S. 417 ................................................................................................10, 11

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 192 F. Supp. 2d 321
    (D.N.J. 2002), *aff'd on other grounds,* 342 F.3d 191 (3d Cir. 2003). .......................19

## Statutory Provisions

Section 101 of the Copyright Act, 17 U.S.C. § 101 .......................................14, 15, 16, 18, 19

Section 106 of the Copyright Act, 17 U.S.C. § 106 .......................................7, 14, 16

Section 111 of the Copyright Act, 17 U.S.C. § 111 .......................................6, 9, 13

Section 119 of the Copyright Act, 17 U.S.C. § 119.......................................19, 20

Section 512 of the Copyright Act, 17 U.S.C. § 512 .......................................12, 13

## Legislative Materials

H.R. Rep. No. 94-1476 (1975)....................................................................12, 14, 15

H.R. Rep. No. 102-997 (1992)....................................................................12

H.R. Rep. No. 105-551 (1998)....................................................................12, 13

## Miscellaneous

2 M. & D. Nimmer, *Nimmer on Copyright*, § 8.14[C][3] (2006)....................................18

**List of Abbreviations**

| | |
|---|---|
| 56.1 Statement | Local Civil Rule 56.1 Statement of Plaintiffs in No. 06 Civ. 3990, dated Aug. 25, 2006 |
| 56.1 CSF | Counterstatement of Material Facts Pursuant to Local Rule 56.1(b) in Opposition to Cablevision's Motion for Summary Judgment in No. 06 Civ. 3990, dated Sept. 22, 2006 |
| Cablevision | Defendants/Counterclaim-Plaintiffs Cablevision Systems Corporation and CSC Holdings, Inc. |
| CV Mem. | Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated Aug. 25, 2006 |
| Lackman Decl. | Declaration of Eleanor M. Lackman, dated Aug. 25, 2006 |
| Lackman Opp. Decl. | Declaration of Eleanor M. Lackman, dated Sept. 22, 2006 |
| Pl. Mem. | Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment in No. 06 Civ. 3990, dated Aug. 25, 2006 |
| Plaintiffs | Plaintiffs/Counterclaim-Defendants Twentieth Century Fox Film Corporation, Universal City Studios Productions LLLP, Paramount Pictures Corporation, Disney Enterprises, Inc., CBS Broadcasting Inc., American Broadcasting Companies, Inc. and NBC Studios, Inc. |
| Turner Mem. | Memorandum of Law in Support of Turner's Motion for Summary Judgment in No. 06 Civ. 4092, dated Aug. 25, 2006 |
| Turner 56.1 Statement | Statement of Material Facts Pursuant to Local Rule 56.1(a) in Support of Turner's Motion for Summary Judgment in No. 06 Civ. 4092, dated Aug. 25, 2006 |

## PRELIMINARY STATEMENT

The offering that Cablevision's motion purports to defend bears little resemblance to the Service that Cablevision has proposed to offer and that Plaintiffs are challenging.

1.    Cablevision's proposed Service would not "merely supply[] machinery that allows others to copy." CV Mem. at 13; *see also id.* at 3-6, 11, 14 & 17. Rather, Cablevision would provide paying subscribers with a turnkey copying, storage and retransmission service for converting linear programming into on-demand video, from soup to nuts. The subscriber would do no more than identify a program (from among those that Cablevision chooses to offer) by clicking a button on a TV remote control. Cablevision would do everything else to ensure that the subscriber can view that program at whatever time he or she requests -- just as it ensures that the subscriber can view a program provided by a licensed video-on-demand ("VOD") service, *e.g.,* HBO On Demand, whenever he or she requests.

To be sure, Cablevision would operate a montage of servers, routers, switches and other hardware and software as part of its unauthorized Service. But Cablevision's role in directly infringing copyright owners' rights would go beyond merely operating equipment:

- Cablevision would select all the linear channels of programming that it would make eligible for reproduction, storage and retransmission as part of the Service, including programming owned by Plaintiffs;

- Cablevision would split those channels into two identical "streams" -- one that Cablevision would use for its regular cable service (presumably in accordance with negotiated and compulsory licenses) and one that Cablevision would use for its proposed Service (outside those licenses);

- Cablevision would reformat and copy into computer memory each and every frame of each and every program in the unauthorized stream, regardless of whether any subscriber requested that that program be copied;

- Cablevision would authorize each of its subscribers, upon payment of a separate monthly fee, to identify programs on the unauthorized stream (and only those programs) to be copied;

- 1 -

- Cablevision would ensure that its equipment made one disk copy of each program for each subscriber that requested the program be copied;

- Cablevision would store each such copy, for an indefinite period of time, on Cablevision servers (and only on Cablevision servers) located at Cablevision facilities that would be inaccessible to subscribers;

- Cablevision would retransmit the copied programs to the associated subscriber on-demand, *i.e.*, whenever, and as often as, that subscriber requests, in addition to retransmitting that program to the subscriber simultaneously with the program's airing on a linear channel; and

- Cablevision would establish the policies for deciding when to honor any subscriber's request that Cablevision copy, store or retransmit a particular program -- policies that Cablevision could alter at any time.

*See* pp. 6-7 *infra.*

2.     The proposed Service is not a Kinko's that simply places a self-service copying machine in its store or a Xerox that merely leases a copier to a large company.  *See* CV Mem. at 4, 17-18.  Kinko's and Xerox (unlike Cablevision) do not have any role in choosing, and they do not provide their customers with, the works that may be copied.  They do not limit copying to only works they offer.  They do not store the copies in their facilities.  They do not set limits on how much or how little can be copied or when those copies must be destroyed.  They do not maintain databases on the works that are copied.  And they do not transmit the contents of the copied works to their customers.

Cablevision's proposed Service is also significantly different from the service provided by ISPs (Internet Service Providers).  *See* CV Mem. at 4 & 20-29.  ISPs have a wide variety of content thrust upon them by third parties.  Congress and the courts have concluded that holding ISPs liable for direct copyright infringement, when they serve as purely passive intermediaries transporting content from one point to another, may threaten the entire operation of the Internet. *See* pp. 11-13 *infra;* Pl. Mem. at 18 n.4.

In contrast, Cablevision's subscribers do not thrust copyrighted programming on Cablevision.   Cablevision is the one that decides, in the first instance, which channels of programming to make available to its subscribers.   No program would be copied, stored or retransmitted as part of Cablevision's proposed Service unless Cablevision selects and offers a linear channel on which that program appears and then takes the steps necessary to route that channel through the Service equipment.   Cablevision would be a provider of on-demand video services, not a passive intermediary.   Requiring Cablevision to obtain licenses for that Service would not threaten Cablevision's economic existence (let alone the existence of the entire cable industry or the Internet); nor would it prevent consumers from obtaining on-demand access to a wealth of programming offered by services that Plaintiffs and others license.

Cablevision's proposed Service also bears no resemblance to a Sony Betamax (or any other VCR).  *See* CV Mem. at 2, 4 & 14-15.  As a VCR manufacturer, Sony did no more than *sell* a stand-alone product to its customers.  Sony was not involved in any copying or public performance; indeed, Sony had no involvement whatsoever with its customers or the Betamax once the sale had been made.  Sony did not operate or maintain the Betamax for any customer.  Sony did not select the universe of programs from which its customers could identify the ones they wished to record on the equipment they had purchased.   Sony did not store any programming for its customers.  Sony did not create and maintain databases listing all the programs recorded and the subscribers for whom they were recorded.   And Sony did not retransmit any copied programming to its customers.

All of Cablevision's misguided analogies have at least one element in common: They involve situations where a consumer, already in possession of copyrighted content, uses some equipment or system to make a copy (or an additional copy) of that content; and the seller or

- 3 -

operator of the equipment or system – Sony, Xerox, Kinko's or an ISP – is a complete stranger to the content being copied. But with Cablevision's proposed Service, it is Cablevision, not the subscriber, that possesses the content from which the unauthorized copies of content are made. It is Cablevision, not the subscriber, that intentionally routes that content into special video servers to facilitate copying. And it is Cablevision that, for a price, offers to make a copy of that content and to retransmit that content on-demand for subscribers if they simply push a button.

3. Cablevision says there are "indisputable similarities" between its proposed Service and set-top DVRs and thus the Service must be lawful.[1] CV Mem. at 3. But any such "similarities" are irrelevant to the issue of whether the Service would infringe copyright owners' rights. Set-top DVRs simply do not set the legal standard against which Cablevision's proposed Service must be measured. No court has ever determined that it is lawful for a cable operator to provide set-top DVRs; and, contrary to Cablevision's claims, copyright owners have not "accepted" (*id.* at 16) such conduct as lawful. *See* note 3 *infra*.

In any event, there are significant differences between Cablevision's proposed Service and set-top DVRs. The Service entails the copying and storage of programming on servers located at Cablevision's facilities, and the subsequent retransmission of that programming from

---

[1] In its papers before this Court, Cablevision has re-named "set-top DVR" as "Set-Top Storage DVR" or "STS-DVR." *See* CV Mem. at 1. Cablevision apparently has done so to create the perception that its Service, for which it previously "created" the term "RS-DVR" or "Remote Storage DVR" (*see* 56.1 Statement at ¶ 24), is indistinguishable from the "Set-Top Storage DVR" or "STS-DVR." Semantics does appear to play a large part in Cablevision's case, *e.g.,* Cablevision's adamant refusal to acknowledge that its Service is in fact a "service" rather than a "product" (*see* Order dated June 7, 2006) even though outside of this proceeding Cablevision markets its supposedly comparable set-top DVR to subscribers as a "service." *See, e.g.,* Lackman Opp. Decl. at Exhibit 1 (pages from Cablevision web site repeatedly describing the provision of traditional set-top DVRs as a "service"); *see also* 56.1 CSF at ¶ 1 (internal Cablevision documents refer to RS-DVR as a "service"). At no point in the depositions of this case did any witness (Cablevision or otherwise) use the term "Set Top Storage DVR" or "STS-DVR," and a Google search of the terms "Set-Top Storage DVR" and "STS-DVR" reveals no hits concerning DVRs except in articles quoting Cablevision's papers in this action. Accordingly, Plaintiffs will continue to use the conventional industry term "set-top DVR."

the remote servers to subscribers on-demand. Such retransmissions would reach not only the requesting subscribers but other Cablevision customers as well, in a supposedly encrypted form over which copyright owners have no control. To make on-demand copies and retransmissions, Cablevision would create a separate "stream" of programming unauthorized by negotiated and compulsory licenses. None of these activities is involved with set-top DVRs that copy and store programs within the privacy of a subscriber's home and make no retransmissions of programming to or from remote locations. The mere fact that the proposed Service involves retransmissions of programming from a centralized location to subscriber homes is itself a sufficient basis, under copyright law, for distinguishing that Service from set-top DVRs.[2]

The Service's use of the centralized remote server from which program retransmissions are made is the hallmark of a VOD service that requires a license. *See* FCC Competition Report (Lackman Decl. Ex. A) ("Video-on-demand (VOD) allows subscribers to select at any time movies and other programs they wish to view from a selection of titles stored on a remote server"). Cablevision's distinction between VOD and the proposed Service lies in the method by which Cablevision seeks to obtain the programming to be retransmitted. With VOD, Cablevision negotiates appropriate licenses. With the proposed Service, Cablevision would substitute subscriber requests for negotiated licenses. In short, Cablevision's assertion that the difference between its Service and set-top DVRs is "only one of architecture" (CV Mem. at 3) distorts and trivializes the significance of that difference to the industry.[3]

---

[2] *Compare Columbia Pictures Indus. v. Professional Real Estate Investors, Inc.*, 866 F.2d 278, 281-82 (9th Cir. 1989) (providing hotel guests with in-room equipment to view movies on videodisc does not constitute copyright infringement) *with On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787, 789-90 (N.D. Cal. 1991) (transmitting movies from centralized location in hotel to guests infringes copyright owners' public performance right).

[3] The industry has recognized that the proposed Service raises serious copyright issues. In the approximately two months prior to the May 2006 filing of this action, various press accounts

Footnote continued on next page

4.     Cablevision says that a change from set-top DVRs to its Service would be "imperceptible to the subscriber." CV Mem. at 2. It may be that a subscriber would perceive little or no apparent difference with any such change. But a subscriber also perceives little or no apparent difference between requesting a program available on a licensed VOD service and requesting a program available on Cablevision's proposed unlicensed Service. In both cases, the subscriber clicks a button and is able to view a specific program at the time he or she chooses with the ability to fast-forward, pause and rewind.

In any event, subscriber perceptions are immaterial to a proper resolution of copyright issues. Subscribers may, for example, perceive no difference between Cablevision's offering of programming in compliance with the Section 111 compulsory license and Cablevision's offering of programming in violation of the Section 111 compulsory license. Those subscriber perceptions, however, provide no guidance for the Court in determining whether the cable operator has in fact complied with the law.

## COUNTERSTATEMENT OF FACTS

Cablevision provides a list of "facts" it says are "dispositive" and "not in dispute." CV Mem. at 7. That list, however, fails to include facts that are relevant under the law to resolving the issues in this case, and contains misleading characterizations of facts:

- Cablevision says nothing about its role in making programming available for copying, storage and retransmission. It leaves the misimpression that subscribers would have total control over which programs are copied, stored and retransmitted -- that subscribers would "initiate" the entire process. However, no program can be copied, stored or

---

Footnote continued from previous page
discussed Cablevision's March 2006 announcement of the proposed Service. These accounts generally predicted that copyright owners would challenge the Service in court. *See* Lackman Opp. Decl. at Exhibit 2 (attaching articles). Cablevision itself recognized that it was pushing the envelope, as reflected in its unsolicited form letter to the industry attempting to defend the proposed Service as "fair use" (a defense it has since abandoned). *See* Budill Ex. 4 (Annex to Turner 56.1 Statement at Tab 36); 56.1 CSF at ¶ 1.

retransmitted unless, in the first instance, (1) that program is included on a linear programming channel that Cablevision itself has selected (from the hundreds that are available); (2) Cablevision chooses to offer that channel as part of its proposed Service; and (3) Cablevision takes the technical steps to split its program offerings into two streams -- one that Cablevision would route over equipment as part of its regular cable service and one that it would reformat and route over separate equipment as part of its proposed Service. Cablevision already has made and revised multiple determinations as to how many channels of programs would be offered and whether those channels would include, for example, VOD programming, music programming and pay-per-view programming. Cablevision, not the subscriber, would initiate the process contemplated by the proposed Service. *See* 56.1 CSF at ¶¶ 4 & 6.

- Cablevision claims that a program is copied, stored and retransmitted only in response to subscriber requests. That is not the case. In routing one program stream for the proposed Service, Cablevision would make "buffer" copies of each and every program -- regardless of whether any subscriber requests that a copy be made. A "buffer" copy is one that is placed in a computer's random access memory ("RAM") for a period long enough to permit reproduction. *See* 56.1 CSF at ¶¶ 8 & 12.

- Cablevision claims that each copy of a program would be "uniquely associated" with the subscriber that requested it. That also is incorrect. Multiple buffer copies would be created of each program that is copied, stored and retransmitted as part of the Service. These copies would not be uniquely associated with particular subscribers. *See* 56.1 CSF at ¶¶ 10 & 12.

- Cablevision leaves the misimpression that subscribers would simply "play back" their own copies by pushing a button on their remote controls. Cablevision makes no mention of the steps that Cablevision itself would take to retransmit that programming from its head-end to the subscribers' set-top boxes -- retransmissions that, as discussed below, constitute "public performances" under copyright law. *See* 56.1 CSF at ¶¶ 10 & 11.

- Cablevision says that subscribers would "command" that programs be copied, stored and "played back." In fact, all the subscribers are permitted to do is to identify programs -- which Cablevision construes as "requests" (the term that Cablevision's own employees repeatedly used throughout their depositions) -- to copy or retransmit. Cablevision would deny the request if it is inconsistent with policies that Cablevision alone has established. *See* 56.1 CSF at ¶¶ 4, 8, 10 & 11.

## ARGUMENT

Well-established law makes clear that, absent the requisite licenses from affected copyright owners, Cablevision's proposed Service would directly infringe those owners' exclusive rights of reproduction and public performance under Section 106 of the Copyright Act.

*See* Pl. Mem. at 4-20. Aside from inapposite analogies (discussed above), Cablevision raises what amount to only two arguments in support of its motion for summary judgment: (1) Plaintiffs should have sued for contributory, rather than direct, infringement; and (2) Cablevision's proposed Service would not make public performances. Neither argument is valid.[4]

### A. Plaintiffs Have Properly Challenged Cablevision's Proposed Service As Direct Infringement.

1. According to Cablevision, "merely supplying machinery that allows others to copy is insufficient to establish direct infringement, and can at most establish indirect liability." *Id.* at 13. Cablevision, however, would not "merely supply machinery." *See* pp. 1-2 & 6-7 *supra*. The companies that would "merely supply machinery" are Arroyo, Big Band Networks, Ciena and so forth -- all of which manufacture the numerous pieces of equipment that Cablevision would operate and maintain in order to provide its Service, and none of which is being sued. The defense that Cablevision asserts is the defense that belongs to these equipment providers, not to Cablevision as the provider of the Service.

---

[4] Cablevision suggests that Plaintiffs are barred from challenging the proposed Service because they have not previously challenged set-top DVRs. Copyright owners, however, have the right to decide where to draw the line in contesting infringing uses of their works. Absent defenses of estoppel, waiver, abandonment, laches or statute of limitations (all of which Cablevision has waived), a determination not to challenge certain conduct does not prevent a copyright owner from proceeding against other conduct. *See, e.g., Capitol Records, Inc. v. Naxos of America, Inc.,* 372 F.3d 471, 484 (2d Cir. 2004) ("failure to pursue third-party infringers has regularly been rejected as a defense to copyright infringement or as an indication of abandonment"), citing *Paramount Pictures Corp. v. Carol Publ'g Group,* 11 F. Supp. 2d 329, 336 (S.D.N.Y. 1998) ("the lack of earlier litigation against other similar works is simply irrelevant"), *aff'd mem.,* 181 F.3d 83 (2d Cir. 1999). In any event, copyright owners have challenged the type of service that Cablevision is proposing. *See* Lackman Opp. Decl. at Exhibit 3 (complaint against RecordTV.com, an Internet-based DVR service that recorded programming from a cable system and streamed that programming to subscribers on-demand). They also have brought litigation where, as here, a commercial entity sought to transcend the limited boundaries of the *Sony* decision. *See id.* at Exhibit 4 (action against ReplayTV).

Cablevision itself acknowledges that direct liability exists where a defendant engages in "'activities which are reserved to copyright owners.'" CV Mem. at 12, quoting *Playboy Enters. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 512 (N.D. Ohio 1997) (emphasis omitted). *See also* CV Mem. at 11, 13. There are not many "activities" that are more squarely "reserved to copyright owners" than authorizing the type of commercial on-demand programming service that Cablevision has proposed. Cablevision's Service would retransmit copyrighted programs stored on centralized servers to individual subscribers on-demand. This is precisely the type of activity that is involved with VOD operations for which Cablevision and other cable operators routinely obtain licenses. A cable operator's retransmitting video programming to paying subscribers also is the type of activity that Congress, when it enacted Section 111 of the Copyright Act, determined to be a public performance requiring copyright licenses.[5]

2.      Without any supporting citation, Cablevision claims the Supreme Court in *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*"), established the principle that "providing the machinery used by consumer [sic] is only actionable, if at all, under a theory of indirect infringement." CV Mem. at 14; *see also id.* at 2, 3 & 15. The Court established no such thing. The Court held only that it would employ a contributory infringement analysis where the machinery used for copying alone had been *sold* by Sony as a stand-alone product and there was no on-going relationship between Sony and the consumer; accordingly, it grounded its decision upon a provision of the Patent Code that deals solely with "sales" of a component of patented machines that may be considered "staple articles of commerce." *See* 464 U.S. at 439-

---

[5] Cablevision appears to argue that it can be liable for only direct infringement or contributory infringement but not both. That is not the law. Courts have found a single defendant liable on both theories. *See, e.g., Playboy Enters. v. Russ Hardenburgh, Inc., supra*, 982 F. Supp. at 513-15; *Creative Labs, Inc. v. Cyrix Corp.*, No. C 97-0912, 1997 WL 337553, at *4 (N.D. Cal. May 7, 1997).

42.  As the Court noted in *New York Times Co. v. Tasini,* 533 U.S. 483 (2001), *"Sony* held that the *'sale* of copying equipment' does not constitute contributory infringement" under certain circumstances. *Id.* at 504 (emphasis added). *See also* Pl. Mem. at 18-19 n.5.

The Supreme Court in *Sony* agreed with the district court below that "'the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn . . . .'" 464 U.S. at 435 n.17, quoting *Universal City Studios, Inc. v. Sony Corp. of Am.,* 480 F. Supp. 429, 457-58 (C.D. Cal. 1979); *accord Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913 n.9 (2005).  However, the Court in *Sony* did not identify where that line should be drawn.  The Court did not say, as Cablevision argues, that those who supply machinery used by customers can be liable for contributory infringement alone.  And it certainly did not suggest that the type of comprehensive reproduction, storage and secondary transmission service that Cablevision proposes can be considered only as contributory rather than direct infringement.  Indeed, courts have frequently found direct infringement where, in circumstances analogous to the present case, the defendants offered an infringing service, including the provision of equipment or other facilities used to make unauthorized reproductions or retransmissions. *See* Pl. Mem. at 11-14 & 17-18; *cf. Perfect 10 v. Google, Inc.,* 416 F. Supp. 2d 828, 839, 843-44 (C.D. Cal. 2006) (defendant directly infringes public display right if it stores the content and serves that content to the requesting user).

3.  Cablevision also points to what it terms "an often-overlooked portion" of *Sony* where the district court concluded that Sony was not a direct infringer.  CV Mem. at 15.  To reach that conclusion, however, the *Sony* district court adopted an analysis that is squarely at odds with Cablevision's theory of the law.  Indeed, the district court specifically noted: "It is true that one can be found to have infringed directly even without participating in the actual

- 10 -

infringing activity." *Universal City Studios*, 480 F. Supp. at 458; *contra* CV Mem. at 30 (the "party must be actively engaged in the infringing activity itself."). The district court then distinguished certain direct infringement cases, concluding that the "involvement of the defendants in the infringing activity . . . was much more substantial and direct than that alleged against" Sony. *Universal City Studios*, 480 F. Supp. at 458. The district court found these direct infringement cases distinguishable because Sony, unlike the defendants in the other case, simply manufactured and sold the Betamax and did not

> loan or otherwise provide the copyrighted work. Rather, copyright owners sell their works for broadcast to the public free of charge over public airwaves. The copying occurs not in a store operated and managed by the defendants but rather in a person's home, a location in which individual privacy is constitutionally protected and over which defendants have no control.

*Id.* at 458, distinguishing *Elektra Records Co. v. Gem Elec. Distribs., Inc.*, 360 F. Supp. 821, 824-25 (E.D.N.Y. 1973) (court held that copy shop directly infringed).

In contrast to *Sony*, Cablevision has not manufactured, nor would it sell its subscribers, any equipment; it would provide its subscribers with the universe of programming eligible for copying; that programming would include programming available only by subscription (indeed, it would include programming that copyright owners seek to license on an on-demand basis); and the unauthorized copying would occur not in the privacy of the subscribers' homes but in facilities over which Cablevision alone has total control. The very facts that supported a finding of no direct infringement by the *Sony* district court compel the opposite conclusion for Cablevision's proposed Service.

4.      Cablevision relies heavily upon a line of cases that originate from outside the Second Circuit and that deal with the distinction between direct infringement and contributory infringement solely in the context of the Internet. *See* CV Mem. at 20-26, citing *Religious Tech.*

*Ctr. v. Netcom On-Line Commc'n Svcs., Inc.*, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995) ("*Netcom*") (direct infringement by an ISP requires "some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party"). Cablevision asks this Court to become the first court (in any jurisdiction) to extend *Netcom* to cable television operators when they provide television programming services -- even though Congress expressly refused to do exactly that when it enacted the Digital Millennium Copyright Act of 1998. *See* H.R. Rep. No. 105-551, 105th Cong., at 24 (2d Sess. 1998) (consideration of *Netcom* in early draft of legislation that ultimately became 17 U.S.C. § 512 (Supplemental Statutory Appendix at Tab 8)); *id.* at 63 (17 U.S.C. § 512 applies only to ISPs and does not apply to cable operators when they provide television programming services).

Plaintiffs already have explained that *Netcom* and its progeny do not provide any comfort to Cablevision. Pl. Mem. at 18 n.4; pp. 2-3 *supra*. Two points should be emphasized. *First,* even if *Netcom's* requirements of "volition" and "causation" could be reconciled with the fundamental principle that "copyright is a strict liability tort" that does not require an intent to infringe (and they cannot),[6] Cablevision's conduct in providing the proposed Service would fully satisfy the *Netcom* requirements. *See* pp. 1-2 & 6-7 *supra*. *Second*, Cablevision's argument mischaracterizes the *Netcom* cases as precluding a finding of direct infringement whenever the defendant automatically makes copies or retransmissions in response to user requests. The

---

[6] H.R. Rep. No. 102-997 at 5 (1992), citing *Buck v. Jewell-La Salle Realty Co.,* 283 U.S. 191, 198 (1931). In *Jewell-La Salle,* the Court held that a hotel operator that provided its guests radio broadcast programming without a license infringed plaintiff's performance right under the 1909 Copyright Act. The defendant had argued that it was not engaged in a performance because it had no control over the programming and "must accept whatever program is transmitted." *Id.* The Court rejected that argument, stating: "Intention to infringe is not essential under the Act." *Id.* *See* H.R. Rep. No. 94-1476 at 87 (accepting interpretation of *Jewell-La Salle* that, among other things, the "further transmission of a broadcast to the public, is considered an infringing act").

courts and Congress have recognized that *Netcom* has no applicability (and direct infringement may be found) where the defendant is directly or indirectly involved in providing the material to be copied.[7] Just as the district court in *Sony* attached decisional significance to the fact that Sony had no involvement in providing the television programming to be copied (*see* p. 6-7 *supra*), the fact that Cablevision has such involvement renders *Netcom* and its progeny inapplicable to Cablevision's proposed Service.

### B.      Cablevision's Proposed Service Would Make Public Performances.

Cablevision proposes to retransmit television programs from its head-end to individual subscribers at whatever times those subscribers request (in addition to providing those programs simultaneously with their airing on linear channels).   Such on-demand retransmissions (unauthorized by the Section 111 compulsory license or by negotiated licenses) would directly

---

[7]  In *Netcom* a third party made an infringing copy of a copyrighted work which he posted on a Bulletin Board Service ("BBS"); the BBS gained access to the Internet through the defendant ISP.   The ISP, which had no direct relationship with the third party, played no role in selecting the copyrighted work -- a fact the court considered relevant in finding that the ISP did not directly infringe.  *See* 907 F. Supp. at 1368 & 1372 ("Netcom does not create or control the content of the information available to its subscribers"); *id.* at 1367 ("Netcom was not itself the source of any of the infringing materials on its system . . . .").  In *Playboy Enters., Inc. v. Webbworld, Inc.,* 968 F. Supp. 1171, 1175 (N.D. Tex. 1997), the court refused to apply *Netcom* to a defendant that provided content, noting: "Where Netcom gets paid for providing Internet access for its customers, [defendant] gets paid for selling images it stores on its computers." *Accord Playboy Enters., Inc. v. Webbworld, Inc.,* 991 F. Supp. 543, 552-53 (N.D. Tex. 1997), *aff'd mem.,* 168 F.3d 486 (5th Cir. 1999).  In *CoStar Group, Inc. v. LoopNet, Inc.,* 373 F.3d 544, 556 (4th Cir. 2004), the court emphasized that the defendant did "not attempt to search out or select photographs" that were posted on its web site; *see also id.* at 558-59 (Gregory, J., dissenting) (concluding that *Netcom*  was inapplicable because defendant reviewed the photographs to ensure that they did not obviously infringe any copyright).  Likewise, when Congress considered the ISP "safe harbor" legislation that became Section 512 of the Copyright Act, it interpreted *Netcom* as making ISPs ineligible for a safe harbor if they are involved in the "selection of the materials." 17 U.S.C. § 512(a)(2) (Supplemental Statutory Appendix at Tab 8). The term "selection of the material'" in subsection (a)(2) means, among other things, that the ISP may not determine "the specific sources of material to place on-line (e.g., a radio station) . . . ." H.R. Rep. No. 105-551 at 51.  Cablevision, of course, would determine the "specific sources of material" available on its proposed Service.

infringe copyright owners' exclusive right of public performance.  *See* Pl. Mem. at 6-15. Cablevision's argument that it would not make public performances misstates copyright law.

1.      Cablevision argues that its Service would not make any "performance" because the performance "is done by the customer." CV Mem. at 30.  That argument is inconsistent with the broad statutory definition of the term "perform," the legislative history explaining the breadth of that definition, and the Second Circuit case law interpreting that term broadly (*see* Pl. Mem. at 7-8 & 13-14) -- none of which is mentioned by Cablevision.  Even if one could say that the subscriber performs a program when he or she requests that that program be streamed by Cablevision, that does not preclude a finding that Cablevision also is performing the same program at the same time.  Both the cable operator and its subscriber make a performance, within the meaning of Sections 101 and 106 of the Copyright Act, when (a) the cable operator retransmits a program at the subscriber's request, and (b) the subscriber turns on his or her TV to view that program.  As the House Report accompanying the 1976 Copyright Act states, a performance

> cover[s] not only the initial rendition or showing, but also any further act by which the rendition or showing is transmitted or communicated to the public.   Thus, for example: a singer is performing when he sings a song; a broadcasting network is performing when it transmits his performance (whether simultaneously or from records); a local broadcaster is performing when it transmits the network broadcast; *a cable television system is performing when it retransmits the broadcast to its subscribers*; *and any individual is performing whenever he or she* plays a phonorecord embodying the performance or *communicates the performance by turning on a receiving set. . . .*

> A performance may be accomplished "either directly or by means of any device or process," including all kinds of equipment for reproducing or amplifying sounds or visual images, any sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques and systems not yet in use or even invented.

H.R. Rep. No. 94-1476 at 63 (1975) (emphasis added); *see also Buck v. Jewell-La Salle Realty Co.*, 283 U.S. at 198 (recognizing that under the 1909 Copyright Act more than one party may "perform" a work at the same time").

2.    Cablevision argues that its on-demand retransmissions would not constitute "public" performances.  In support, Cablevision originally purported to quote from the House Report accompanying the 1976 Act: "'[I]f a transmission is available to only one person, then it clearly fails to qualify as 'public.'  For it neither directly reaches 'a substantial number of persons,' nor is it transmitted to a place where such a grouping is congregated.'"  CV Mem. at 34-35, purportedly quoting H.R. Rep. No. 94-1476 at 64-65.   But, as Cablevision now acknowledges, the quoted passage does not appear anywhere in the House Report or anywhere else in the legislative history of the Copyright Act.

Congress did not say, in the text or the legislative history of the Copyright Act, that a transmission must go to a "substantial number of persons" to qualify as a public performance. To the contrary, Section 101 of the Act provides in relevant part that:

> To perform or to display a work "publicly" means
>
> (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
>
> (2) to *transmit* or otherwise communicate a *performance* or display *of the work* to a place specified by clause (1) *or to the public,* by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and *at the same time or different times.*

17 U.S.C. § 101 (emphasis added) (Statutory Appendix at Tab 1); *see id.* ("To 'transmit' a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.").   As this language states, Congress

decided in clause (2) (the "Transmit Clause") that transmission of a work "to the public" is a public performance, regardless of whether it reaches a "substantial number of persons."

In any event, Cablevision's proposed Service would not make transmissions "to only one person," as Cablevision contends.  Cablevision would transmit the same performance in a program to multiple subscribers -- once when that program initially airs on a linear channel and subsequently whenever any Service subscriber requests to view that program., *i.e.*, each performance that Cablevision would retransmit on-demand to "one person" also would be retransmitted by Cablevision to that subscriber and other subscribers at a different time or times. The language and legislative history of Section 101 make clear that all such transmissions are considered together and constitute a "public performance." *See* Pl. Mem. at 7-9.

Cablevision's incorrect interpretation of the term "public performance" appears predicated upon its assertion that Cablevision would transmit the subscriber's own unique "copy" to the subscriber -- a process that it euphemistically terms as "playback" or "retrieval" of the subscriber's copy. *See, e.g.,* CV Mem. at 34 ("each individual customer's copy of any given program (made by that customer) is transmitted only to that customer's set-top box"); *id.* at 10 ("what is played back to the customer is his own unique copy"). Cablevision, however, would not transmit a "copy"; the copy itself would never leave Cablevision's server.[8]  Cablevision would instead retransmit the program, more specifically the *performance* embodied in that program -- the same *performance* that it had transmitted and would retransmit to multiple other subscribers at a different time or times.

---

[8] To the extent Cablevision would provide (or offer to provide) copies of programs to its subscribers, it would of course infringe Plaintiffs' exclusive right of public distribution under 17 U.S.C. § 106(3). *See* Turner Mem. at 19-20.

3.      Cablevision acknowledges (CV Mem. at 32-34) that courts have found direct infringement of public performance rights in circumstances analogous to the present case. *See* Pl. Mem. at 11-13, citing *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787 (N.D. Cal. 1991) ("*On Command*"), and *Columbia Pictures Indus. v. Redd Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984) ("*Redd Horne*").   In these cases the defendants used centralized equipment to make on-demand transmissions of movies to individual hotel guests (*On Command*) and to individual customers gathered in a separate part of the defendant's store (*Redd Horne*).   Cablevision attempts to distinguish this obviously relevant authority on the basis of its "shared copy" theory, *i.e.*, that the courts found infringing public performances only because the defendants used a single copy of a movie to make their multiple transmissions. *See* CV Mem. at 32-34.

There should be no mistake about the theory Cablevision asks this Court to adopt. Cablevision appears to acknowledge that if it makes only one copy of a television program, which it stores on a server and uses to retransmit the performance on-demand to multiple subscribers, it would be liable for copyright infringement.  However, by making one copy of the performance for *each* subscriber (resulting in perhaps hundreds or thousands of copies of the program being stored on Cablevision servers), Cablevision contends that it will avoid copyright infringement.  In other words, *Cablevision's theory is that the making of one unauthorized copy of a copyrighted program equals copyright infringement but the making of hundreds or thousands of unauthorized copies of that program somehow equals no infringement.*  This remarkable theory has no basis in the law; nor does it have any basis in logic, sound copyright policy or the facts.

- 17 -

To be sure, Cablevision has sought to design its Service so that each of the copies of a particular program would be "uniquely identified" with a particular subscriber's set-top box -- an obviously inefficient system that has no apparent purpose other than to support an argument for not having to obtain the requisite copyright licenses. Cablevision, however, has failed to achieve its goal. The Service necessarily makes buffer copies of programs that are not associated with any particular subscriber. *See* p. 7 *supra*. Cablevision recognizes as much, but argues that such copies are not "copies" within the meaning of Section 101 of the Copyright Act. CV Mem. at 29. That argument is contrary to law. *See* Pl. Mem. at 16 n.3. Indeed, even the authority upon which Cablevision itself relies heavily (albeit for other propositions) leaves no doubt that the buffer copies come within Section 101. *See Marobie-Fl, Inc. v. National Ass'n of Fire Equip. Distribs.*, 983 F. Supp. 1167, 1177-78 (N.D. Ill. 1997), cited in CV Mem. at 13, 18-19 & 30-31. Those buffer copies satisfy any non-existent "shared copy" requirement.

In any event, nothing in the language or legislative history of the Copyright Act supports Cablevision's "shared copy" theory. As discussed above, Section 101 is clear that a public performance occurs when one transmits the same *performance* to the public; it imposes no requirement that the same *copy* be used for all transmissions. *See* p. 15 *supra*. The only support Cablevision offers for its shared copy theory comes from dicta in the Third Circuit's *Redd Horne* opinion. There is nothing to suggest that the Third Circuit would have reached a different result had each of the defendant's customers requested that defendant use separate copies of the movies for each transmission; there is simply no discussion in *Redd Horne* as to the significance of the defendant's having used one copy rather than separate copies.[9] Furthermore, no court has ever

---

[9] The Third Circuit cited, without discussing, *Nimmer on Copyright*. Nimmer, however, advances a policy basis for the shared copy requirement that has no relevance to the Cablevision situation. According to Nimmer, such a requirement is necessary to avoid the conclusion that,

Footnote continued on next page

held that there is any shared copy requirement. Even courts in the Third Circuit have found a public performance under Section 101's Transmit Clause without discussing whether a shared copy was being used for the transmissions. *See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 331-32 (D.N.J. 2002) (streaming of video clips to individuals over the Internet constituted public performances), *aff'd on other grounds*, 342 F.3d 191 (3d Cir. 2003).

       4.      Cablevision constructs its "no public performance" argument in total disregard of relevant Second Circuit authority. As Plaintiffs have demonstrated, the law in the Second Circuit leaves no doubt that Cablevision's proposed Service would make public performances. *See* Pl. Mem. at 13-15. With one exception, Cablevision cites none of the relevant Second Circuit authority on public performance. The one exception is *National Football League v. Primetime 24 Joint Venture*, No. 98 Civ. 3778, 1999 WL 163181 (S.D.N.Y. Mar. 24, 1999) ("*NFL*"), which Cablevision cites -- not for its discussion of what constitutes a public performance, but for a wholly unrelated proposition. *See* CV Mem. at 12 n.2.

       Primetime 24, the defendant in *NFL*, was a "satellite carrier" that retransmitted broadcast television programming pursuant to the compulsory license in Section 119 of the Copyright Act, 17 U.S.C. § 119 (Supplemental Statutory Appendix at Tab 7). Primetime 24 split its signal into two identical streams -- one that went to customers in the United States and one that went to customers in Canada. The copyright owner argued that that second stream violated the Section 119 compulsory license and constituted an unauthorized public performance because Section 119

---

Footnote continued from previous page
under a literal reading of Section 101, multiple individuals who purchase different copies of the same movie on a videocassette would be engaged in public performances when they played that movie on their home TV sets. *See* 2 M. & D. Nimmer, *Nimmer on Copyright* § 8.14[C][3], at 8-190 - 8-191 (2006). Nimmer does not address the situation where, as here, a single commercial entrepeneur makes multiple retransmissions of the same performance to different subscribers.

permitted retransmissions of broadcast signals only within the United States.  Primetime 24, however, argued that its second stream resulted in public performances only in Canada that were not actionable under U.S. law.

The district court rejected Primetime 24's argument; it found a violation of Section 119 (1999 WL 163181, at *4) and unauthorized public performances by Primetime 24.  *Id.* at 2-3; *accord NFL v. Primetime 24 Joint Venture,* 1999 WL 760130 (S.D.N.Y. 1999).  The Second Circuit affirmed.  As the court of appeals concluded, "the most logical interpretation of the Copyright Act is to hold that a public performance or display includes 'each step in the process by which a protected work wends its way to its audience.'"  211 F.3d 10, 19 (2d Cir. 2000) (citations omitted).  The Second Circuit, like the district court, held that a public performance was made at the step where Primetime 24 split its signal into two streams and directed one of those streams (outside the Section 119 compulsory license) to its Canadian customers.

Under this controlling authority, Cablevision would engage in a public performance when it splits its program lineup into two identical streams, channeling one stream for delivery over its regular cable service (pursuant to its compulsory and negotiated licenses) and the second stream for delivery through its proposed Service (outside of its compulsory and negotiated licenses).  All of Cablevision's technological sleight-of-hand in making hundreds or thousands of copies of each program to create the illusion that each subscriber has his or her own copy is for naught under Second Circuit law as set forth in the *NFL* decision.

## CONCLUSION

Cablevision's motion for summary judgment should be denied and Plaintiffs' motion for summary judgment should be granted.

Dated: September 22, 2006
    Washington, D.C.

Respectfully submitted,

Robert Alan Garrett (pro hac vice)
Hadrian R. Katz (pro hac vice)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000

Peter L. Zimroth (PZ-1029)
Eleanor M. Lackman (EL-3668)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022-4690
(212) 715-1000

*Counsel for Plaintiffs/Counterclaim
Defendants*

Of Counsel:

Simon Barsky (pro hac vice)
Gregory P. Goeckner (pro hac vice)
15503 Ventura Blvd.
Encino, California 91436